UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,       :

               v.               :         18 Cr. 235 (GHW)

TIMOTHY LANGS,          :

                    Defendant.   :
-------------------------------------------------------x

## **EMERGENCY MOTION FOR COMPASSIONATE RELEASE**

DAVID E. PATTON
Federal Defenders of New York
52 Duane Street, 10th floor
New York, NY 10007
By:    Sylvie Levine
         Assistant Federal Defender

GEOFFREY S. BERMAN
United States Attorney
One St. Andrew's Plaza
New York, NY 10007
      By:   Michael McGinnis
          Stephanie Lake
          Assistant United States Attorneys

Timothy Langs, through undersigned counsel, respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release.  The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Langs' health.  The virus thrives in densely packed populations, and the MDC is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Langs.  Mr. Langs' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19.  Allowing Mr. Langs to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus, especially given that the United States Department of Probation has already conducted a home visit at Mr. Langs' wife's home and has deemed it an acceptable location for supervision.

Attached for the Court's consideration in connection with this motion is an expert affidavit that generally addresses the increased public health risks from keeping at-risk inmates incarcerated during the pandemic, *see* Affidavit of Dr. Brie Williams, attached as Exhibit A, and an expert affidavit that specifically address conditions at the MDC, *see* Affidavit of Dr. Jonathan Giftos, attached as Exhibit B.

The Probation Department takes no position on this application.  The Government's position is that Mr. Langs must exhaust his administrative remedies.

I.    **Procedural History.**

On September 11, 2018, this Court sentenced Mr. Langs to 60 months in prison for participating in a narcotics conspiracy.  His projected release date is June 29, 2022.

II.   **Mr. Langs' Current Conditions of Confinement and Health Conditions.**

Mr. Langs is 47 years old and he has been ███████████████████████████████████

2

████████████████████████████████████████.  According to the Center for Disease Control

(CDC), Mr. Langs' diseases mean he is high risk – multiple times over – for life-threatening

consequences should he contract COVID-19.[1] ███████████████████████████████

██████████████████████████████████████████████████████████████████

████████████ █  He takes at least five medications to ███████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████ medical studies have shown that patients who

take such medications are at an increased risk for infection.[3]

The Bureau of Prisons has already acknowledged that Mr. Langs' medical conditions place

him at heightened risk from COVID-19.  Chief Judge McMahon directed the BOP to provide a list

of inmates that are high-risk for contracting COVID-19 and vulnerable to its effects to the Federal

Defenders.  The Federal Defenders confirmed that that Mr. Langs is on that list.

### III.    Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Langs' Sentence and Release Him to Home Confinement.

The First Step Act ("FSA") expressly permits Mr. Langs to move this Court to reduce his

term of imprisonment and seek compassionate release.  *See* 18 U.S.C. § 3583(c)(1)(A)(i).  Under

normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP

declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html.

[2] Anna Miller, et al., 10 common health conditions that may increase risk of death from the coronavirus, ███████████████████, Business Insider (Mar. 23, 2020) (collecting scientific reports of disease), available at  https://www.businessinsider.████████████
████████████████████████████████████████████████████.

Lei Fang et al., ████████████████

██████████████████████████████████                   ███████████████
██████████████████████████████████████████████

warden's receipt of the defendant's request, whichever is earlier.  *Id.*  Mr. Langs' counsel

transmitted Mr. Langs' request to the MDC Warden by email on April 1, 2020.  Although the

BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Langs files this motion

now in light of the urgent nature of this matter.  *See* discussion, *infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of

imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction'

and 'such a reduction is consistent with applicable policy statements issued by the Sentencing

Commission.'"  *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (S.D.N.Y.

Jan. 8, 2020), ECF No. 384.  "In making its decision, a court must also consider "the

[sentencing] factors set forth in section 3553(a) to the extent that they are applicable.""  *Id.*

(quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement

on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is

anachronistic because it has not been updated since passage of the FSA, they still continue to be

guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason."

*See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).  However, the Sentencing

Commission's statements do not constrain the court's independent assessment of whether

"extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step

Act's amendments.  *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28,

2019); *see also Ebbers*, 2020 WL 91399, at *4.  Indeed, "the district courts themselves have the

power to determine what constitute extraordinary and compelling reasons for compassionate

release."  *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020)

(collecting cases).

**A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.**

The Court need not and should not wait for Mr. Langs to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Langs. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place."  476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding.  Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Langs' motion for compassionate release.  *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ."  18 U.S.C. § 3582(c)(1)(A) (emphasis added).  In other

6

words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion

requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the

absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under

the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in

federal court because that provision explicitly provides that "*[n]o action shall be brought* with

respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for

compassionate release before the Court, and when (now, or long after COVID-19 has already

swept through MDC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced

by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass

exhaustion altogether if the warden fails to act on an administrative application for

compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the

Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully

exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden

of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision,

Congress implicitly recognized that the policies underlying compassionate release are not

furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process.

Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in

this instance.  Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise."  *Salfi*, 422 U.S. at 765.  The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release.  *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  And the MDC Legal Department has confirmed to counsel that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic.  Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons.  As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested.  And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up.  That's why the Bay Area is on lockdown.  We don't know who's infected.  Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical.  By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19-MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York City—now the epicenter of the pandemic—waiting even 30 days will be too late.  Accordingly, this Court should exercise jurisdiction over Mr. Langs' emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

Indeed, in *United States v. Wilson Perez*, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF

No. 98,  the Honorable Analisa Torres deemed the exhaustion requirement waived, and held that all three exceptions (futility, incapability, and prejudice) apply to the instant circumstances.  *See also United States v. Latrice Colvin*, No. 19 Cr. 179 (JBA) (D. Conn. Apr. 2, 2020), ECF No. 38 (granting compassionate release and waiving exhaustion requirement); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020WL1659880 (S.D.N.Y. Apr. 3, 2020), at *2 (same); *United States v. Powell*, 94 Cr. 316 (D.D.C. Mar. 28, 2020), ECF No.  98 (same).

### B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Langs' sentence.

#### 1. COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Mr. Langs.

The COVID-19 pandemic continues to roil New York City.  As of today, the City has over 68,000 confirmed positive cases – a number which has more than doubled in the last ten days – and a death toll of more than 2700, with the city deemed an "epicenter" of the crisis.[4] COVID-19 is already sweeping through the city's jails and prisons, too.  As of March 25, 2020, at least 52 inmates and prison employees at Rikers Island and other city jails had tested positive for COVID-19.[5]  Federal facilities are not immune: the BOP has confirmed at least two inmate cases and six staff cases at MDC Brooklyn and one inmate case at MCC New York.[6]  The numbers are likely higher, as testing is limited.  *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the

---

[4] Coronavirus New York Update, The New York Times, available at
https://www.nytimes.com/2020/04/06/nyregion/coronavirus-new-york-update.html.
[5] Sydney Periera, Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to
Release People in Custody, available at https://gothamist.com/news/confirmed-coronavirus-
cases-rise-nyc-jails-increasing-pressure-release-people-custody.
[6] Federal Bureau of Prisons, COVID-19 Coronavirus, available at
https://www.bop.gov/coronavirus/.

infection rate within BOP facilities given that "people are not being tested").  A number of other

inmates are in isolation or quarantine at both MDC Brooklyn and MCC New York.

Conditions of confinement create an ideal environment for the transmission of highly

contagious diseases like COVID-19.  *See* Affidavit of Dr. Brie Williams, attached at Aff. ¶ 14

("Because inmates live in close quarters, there is an extraordinarily high risk of accelerated

transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and

use the same bathrooms and sinks.  . . . . They are not given tissues or sufficient hygiene

supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious

Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting

that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by

crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean

laundry, [and] insufficient infection-control expertise").  BOP employees are complaining that

they lack masks and gloves, hand sanitizer, and even soap.[7]  Pretrial detention centers—like

MDC—are even more imperiled, as detainees transit through weekly.  *See* Williams Aff. ¶ 13

("The risk of exposure is particularly acute in pre-trial facilities where the inmate populations

shift frequently").  Despite the general lockdown in New York State, BOP continues to transport

inmates to and from MDC and MCC and has confirmed, on March 25, 2020, that it will not stop

---

[7] Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk, CBS News (March 19, 2020), available at https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/;  Danielle Ivory, 'We Are Not a Hospital': A Prison Braces for the Coronavirus, N.Y. Times (Mar. 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'" NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

admitting new inmates.[8]  This exacerbates the risk of transmission. Though the BOP emphasizes

that it screens inmates before moving them,[9] as the *Manrique* Court put it: "the [BOP]

management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14

days after exposure, so screening people based on observable symptoms is just a game of catch

up. . . .  We don't know who's infected."  *Manrique*, 2020 WL 1307109, at *1.[10]

    The MDC has disclosed to the Chief Judges that as of March 25, 2020, nearly one-third

of its current population is high-risk within the CDC's definition (537 inmates), creating a

powerful likelihood that the coronavirus will spread throughout the facility, and particularly

endanger the at-risk inmates.  In the context of this unprecedented and rapidly evolving

emergency, the MDC is simply not equipped to provide adequate medical attention to its

detainees, let alone curb the spread of the virus.  It has only three doctors on staff to care for

1700 inmates, 537 of whom are at-risk. *See* Giftos Aff, attached as Exhibit B.  Indeed, as the

Second Circuit recently observed, present information about the COVID-19 epidemic and the

MDC's prior failings in 2019 to adequately protect detainees and allow them access to counsel

and their families following a fire and power outages suggest that the virus's impact will likely

---

[8] Luke Barr, Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;

[9] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp

[10] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests.  He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results.  Between March 16, 2020 and when the positive test result was received on March 21, 2020, this inmate had contact with many other inmates and with correctional officers.

be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778,

2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

### 2. Mr. Langs's vulnerability to COVID-19 due to his high medical risk is an extraordinary and compelling reason that warrants a sentence reduction.

Mr. Langs is particularly vulnerable to COVID-19, as the BOP has already acknowledged

by placing Mr. Langs on the list of high-risk inmates.                                are the hallmark

of those who are most endangered by the instant pandemic.   These are "extraordinary and

compelling reasons" for his release.  *See* Note 1(A), § 1B1.13 (expressly recognizing that "other

reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D)

(recognizing that extraordinary and compelling reasons exists "other than, or in combination

with, the reasons described in subdivisions (A) through (C).").  Here, Mr. Langs' high

susceptibility to COVID-19 falls within the purview of this catchall.  Moreover, courts have

noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an

extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end

there.  Rather, district courts have the freedom to shape the contours of what constitutes an

extraordinary and compelling reason to warrant compassionate release. Given the highly

infectious nature of COVID-19, the inability in a facility like MDC to practice any of the

hygienic and social distancing techniques that the Center for Disease Control has put in place to

prevent rapid transmission, and the fact that Mr. Langs suffers from ailments that have already

been identified as "high risk," this Court should find that Mr. Langs' legitimate medical risk is a

sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing

to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We]

urge you to take necessary steps to protect [inmates in Federal custody] particularly by using

existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of

Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to

protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable

inmates are released or transferred to home confinement, if possible."[11]  And as the Second

Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent

emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the

BOP, including the individual Wardens and the personnel of each facility, is just beginning to be

felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it

may be grave and enduring."  *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively

release elderly and sick inmates who are at high risk of infection, as well as releasing as many

nonviolent offenders as possible in an effort to reduce the incarcerated population and thus

reduce the risk of spread.  For example, on March 25, 2020, New York City announced that it

would release 300 inmates from Rikers Island.[12] Approximately 1,700 inmates have been

released from Los Angeles County Jails,[13] and 1,000 inmates are to be released from New Jersey

jails.[14]  Therefore, while COVID-19 remains an unprecedented emergency, many states (and

politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces.

So, too, should this Court.

---

[11]https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on
%20COVID-19%20and%20FSA%20provisions%20-
%20final%20bipartisan%20text%20with%20signature%20blocks.pdf
[12] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-
inmates-from-rikers-island.html
[13] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-
prevent-coronavirus-outbreak-behind-bars/
[14] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

**3. Courts have granted compassionate release in light of the instant pandemic.**

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19.  *See United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

So, too, have courts across the country.  *See United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate

release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19).

## IV.   The Probation Department has Already Approved Mr. Langs' Residence.

If granted compassionate release, Mr. Langs will reside with his wife, Kissy Langs, at ███ ████████████████████. Ms. Langs and Mr. Langs have been together since 2014, and married in 2016. Together, they have one daughter and Mr. Langs took an active role with her sons from a prior relationship. Ms. Langs wrote a letter to Your Honor at the time of Mr. Langs' sentencing detailing the love and support they provide to one another; all these months later, that is still the case.

The Probation Department for the Eastern District of New York, by Officer Javier Enciso, already completed a home visit and deemed it an acceptable location for supervision. As noted above, Probation takes no position on the release application, but it specifically opposes location monitoring as a requirement at this time.

At his family's private house, Mr. Langs will be able to isolate himself and take the same precautionary measures that all New Yorkers are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary.  None of these precautions are available in prison.  Mr. Langs will receive medical care from his doctors, who are located near their home in Mastic.  We can provide further information about these release plans upon request.

V.    **Conclusion**

For the foregoing reasons, Mr. Langs respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement or hold a hearing as soon as possible.  Should the Court wish to hold a hearing, counsel waives Mr. Langs' appearance and asks that he be allowed to appear telephonically.

Respectfully submitted,
/s/
Sylvie Levine
Assistant Federal Defender